923 F.2d 849
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alfred R. MASTERS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John W. OLIVE, Defendant-Appellant.
 Nos. 90-5154, 90-5155.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 2, 1990.
Decided Jan. 28, 1991.
Rehearing Denied Feb. 27, 1991.
 
 Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Robert D. Potter, Chief District Judge. (CR-89-44-C)
 Douglas McCorkle Martin, Poyner & Spruill, Harold Johnson Bender, Bender & Matus, Charlotte, N.C., for appellant.
 Gail Ann Brodfuehrer, Tax Division, United States Department of Justice, Washington, D.C. (argued), for appellee; Shirley D. Peterson, Assistant Attorney General, Robert E. Lindsay, Alan Hechtkopf, Tax Division, United States Department of Justice, Washington, D.C., Thomas J. Ashcraft, United States Attorney, Charlotte, N.C., on brief.
 W.D.N.C.
 AFFIRMED.
 Before K.K. HALL and NIEMEYER, Circuit Judges, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Alfred R. Masters and John W. Olive were convicted of conspiring to defraud the government by obstructing the collection of federal income taxes, in violation of 18 U.S.C. Sec. 371, and of aiding and assisting in the preparation of false and fraudulent income tax returns, in violation of 26 U.S.C. Sec. 7206(2). Olive was also convicted of filing tax returns that he did not believe to be true, in violation of 26 U.S.C. Sec. 7206(1). The convictions were based on a scheme by which Masters and Olive purchased master sound recordings of musical artists at artificially high prices, paying for them with sham notes, and then leased them to investors with the promise that the investors would enjoy investment tax credits based on the inflated price of the recordings. They appeal their convictions, contending that the tax code provisions governing the creation of investment tax credits were vague and that therefore they could not have formed the requisite criminal intent to violate the law. Additionally, Masters argues that the government failed to identify him at trial as the defendant named in the indictment and that the district court should have instructed the jury that he was entitled to a defense based on the free speech clause of the First Amendment. For the reasons that follow, we affirm.
 
 
 2
 * Prior to 1986, the master sound recordings of musical artists qualified under 26 U.S.C. Sec. 38 as tangible property used in a trade or business, and purchasers of these recordings were entitled to claim an investment tax credit equal to 10% of the purchase price. Moreover, if they leased master recordings to third parties, they could pass through to the lessees the investment tax credit in a proportionate amount. The purchasers could also deduct depreciation expenses from their taxable income based on the original investment value of the recordings.
 
 
 3
 Deciding in 1981 to enter the seemingly lucrative business of selling leasehold interests in sound recordings as tax shelters, Masters and Olive formed Masters Financial, Inc., to act as a sales representative in selling leases of master sound recordings purchased and owned by a Nashville-based company. Unhappy with the relationship, however, they decided in 1982 to form their own company, Music Masters of Charlotte, Ltd., to purchase the recordings. Masters Financial then became the leasing agent of Music Masters. Defendant Masters served as the president and Olive as the vice president/secretary of both Masters Financial and Music Masters, and each owned 50% of the stock of these corporations.
 
 
 4
 Music Masters thus became the purchaser of master sound recordings and, through Masters Financial, its sales representative, leased each recording to as many as 25 investors, who claimed their share of the investment tax credit on their individual tax returns. In addition, Masters and Olive claimed depreciation expenses, based on the cost basis of the recordings, on the corporate tax returns of Music Masters. All of these tax benefits were based on the price paid by Music Masters for the master recordings.
 
 
 5
 The government's case was based on the claim that Masters and Olive artificially inflated the purchase price of the recordings paid by Music Masters. It contended that Music Masters would purchase a recording with a relatively small amount of cash and a large full-recourse promissory note, which, it argues, was a sham. The sellers of the master recordings were willing to sell the recordings to Music Masters for the cash sums alone, and the notes were given simply to create an artificially high purchase price. For example, Music Masters purchased a master recording by Benny Goodman, the famous jazz musician, from Harry Shields, the president of Gold Shield Production, Inc., for $8,000 in cash and a promissory note in the amount of $992,000. Although Shields testified he would have sold the recording for $8,000, without the note, Music Masters used $1,000,000 as its cost basis for computing the investment tax credit and depreciation. Other sellers of master recordings also testified that the promissory notes were meaningless to them. Few, if any, payments were made on the notes. One seller recounted that he did not know what the notes were for and that eventually he used them "to light the fireplace one day." J.A. at 361.
 
 
 6
 The defendants contended, however, that before purchasing the master recordings they obtained appraisals from qualified independent appraisers and that they were not knowledgeable about the value of the recordings. They also engaged the services of accountants and tax attorneys, and, because of the complexity of the tax laws and their status as novices in this area, they contend that they relied utterly on the advice of these hired professionals. They argue that because the tax laws were vague and they relied on professionals, they could not have formed the requisite criminal intent to violate the law, citing to United States v. Mallas, 762 F.2d 361 (4th Cir.1985). They contend that "[t]here is nothing in the law concerning investment tax credits or in the instructions for the ... tax returns to put Defendants on notice of the government's position that the [promissory] notes should not be included in determining the amount of consideration paid for the master recordings." Brief of Appellants at 8. Thus, they contend their convictions should be overturned.
 
 
 7
 In Mallas, the defendants attempted to create tax shelters based on leases of coal property in Kentucky. Investors were required to pay a "royalty" each year of the lease for their interest in the coal property. They then deducted those amounts from their income taxes either in the year when the royalty was paid or when the coal was mined and sold. The government disallowed the deductions, contending that under Treasury Regulations, the investment company formed by the defendants had to possess enough coal property at the beginning of each lease to justify the payment of all royalties expected during the life of the lease. Because the company did not possess that much coal at the inception, although it did at the time royalties became due, the government contended that the scheme was an illegal attempt to evade federal income taxes. The jury agreed and convicted the defendants.
 
 
 8
 On appeal, we reversed the convictions, holding that the government's theory was unsubstantiated by the tax law. "Whether annual advance minimum royalties that are recoupable from warranted coal reserves acquired after execution of a lease but before payment of the royalty may be deducted from gross income is a point of law that is 'vague or highly debatable.' " 762 F.2d at 363. Convictions should not be based on a law that is unclear, because the defendant has not received fair warning of that which the law requires. One cannot be said to have willfully violated a duty if that duty is not knowable. Id.; cf. United States v. Bass, 404 U.S. 336, 347-49 (1971).
 
 
 9
 The issue presented here, however, is not whether the tax laws are vague or highly debatable. On the contrary, both the government and the defendants agree that the law is clear in allowing promissory notes, given in payment for property, to be used to form the cost basis for computing an investment tax credit. The issue here is whether the promissory notes given by the defendants were illusory, so that the real cost basis of the master recordings was only the cash. This was a factual question which was presented to the jury and resolved against the defendants. There was no debatable issue of law. Mallas and the other cases cited by the defendants relating to vagueness and lack of clarity in the tax laws, e.g., United States v. Solomon, 825 F.2d 1292 (9th Cir.1987), cert. denied, 484 U.S. 1046 (1988); United States v. Burton, 737 F.2d 439 (5th Cir.1984), are simply inapposite.
 
 II
 
 10
 Masters raises two other points in support of his appeal. First, he contends that the government failed to identify him at trial as the defendant named in the indictment. He argues that due process requires that the defendant be positively identified as the perpetrator of the alleged crimes.
 
 
 11
 Masters' identity, however, was never an issue; he never contended that he did not commit the acts charged. His defense was based on the argument that the acts that he did commit were not criminal. In his opening statement to the jury, counsel for Masters explained that he represented Masters, that Masters had established Music Masters, and that Masters had taken steps to create tax shelters for investors in master sound recordings. He even introduced Masters to the jury. J.A. at 135. All witnesses who described Masters' involvement during the course of trial did so in the presence of Masters, and no one suggested that Masters was the wrong person. From the time of Masters' arrest, through his initial processing before the magistrate judge and trial, there was never any assertion that the government had accused, arrested or tried the wrong person. Even before this Court, Masters submitted a pro se brief, which he personally signed, arguing that the business arrangements that he concededly had set up were not illegal.
 
 
 12
 "Courtroom identification is not necessary when the evidence is sufficient to permit the inference that the defendant on trial is the person who [committed the acts charged]." United States v. Fern, 696 F.2d 1269, 1276 (11th Cir.1983). Thus the failure of the government to have a witness point to Masters at trial and say, "He was the one," was inconsequential.
 
 
 13
 Masters' final argument, that the district court should have instructed the jury that his conduct was protected by the Free Speech Clause of the First Amendment, is equally without merit. This defense relates to the counts of the indictment which charge Masters with aiding and assisting others in the preparation of false and fraudulent income tax returns. Masters contends that by not alerting the jury to the possibility that he was merely exercising his free speech rights in explaining to investors the tax benefits associated with the sound recordings, the district court committed reversible error.
 
 
 14
 The First Amendment is irrelevant as a defense if the defendant's speech "becomes an integral part of the crime." United States v. Freeman, 761 F.2d 549, 552 (9th Cir.1985), cert. denied, 476 U.S. 1120 (1986). In this case Masters explained the master recordings lease program to the investors and represented to them that the program was legitimate. He advised the investors that they could claim their pro rata shares of the investment tax credits, calculated from the purchase price of the master recordings, which included the face value of the promissory notes. He promised legal assistance to the investors in the event that they were involved in litigation with the Internal Revenue Service. In addition, he provided the investors with documentation which purported to justify the values of the master recordings based on the sham promissory notes. Investors filed their false tax returns using this information.
 
 
 15
 As we noted in United States v. Kelley, 769 F.2d 215, 217 (4th Cir.1985), "The cloak of the First Amendment envelops critical, but abstract, discussions of existing laws, but lends no protection to speech which urges the listeners to commit violations of current law." In this case, the speech of Masters was not a discussion of the law in the abstract, but rather became an "integral part" of the numerous false income tax returns filed by investors. See Freeman, 761 F.2d at 552.
 
 
 16
 Finding no error, we affirm the convictions of both Masters and Olive.
 
 
 17
 AFFIRMED.