935 F.2d 1288
 60 USLW 2048
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frank J. CASO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John R. KIELY, Defendant-Appellant.
 Nos. 90-5830, 90-5831
 United States Court of Appeals, Fourth Circuit.
 Argued March 7, 1991.
Decided June 14, 1991.
As Amended July 17, 1991.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Chief District Judge. (CR-90-98-A)
 Marcus S. Topel, Daniel F. Cook, Topel & Goodman, San Francisco, Cal., (argued), for appellant Caso; William M. Goodman, Deborah A. Trevino, Topel & Goodman, San Francisco, Cal., on brief.
 Joseph Covington, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., (argued) for appellant Kiely; Brenda Gruss, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., on brief.
 Randy I. Bellows, Assistant United States Attorney, Alexandria, Va., (argued) for appellee; Henry E. Hudson, United States Attorney, Alexandria, Va., on brief.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and BRITT, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 Frank J. Caso and John R. Kiely were convicted under 18 U.S.C. Sec. 371 of conspiracy to defraud the government by unlawfully impeding, impairing, and interfering with the Department of Defense's ("DOD") effort to maintain control and security of its classified documents, and with conspiracy to convey without authority property of the United States (classified documents), in violation of 18 U.S.C. Sec. 641. They appeal and assign error to a number of the district court's pre-trial and trial rulings. Finding no error, we affirm their conviction.
 
 
 2
 * Caso and Kiely worked as market researchers for two large defense contractors. Caso worked for Hughes Aircraft, and Kiely was employed by Raytheon Corp. They both had "secret" security clearances, because their jobs included receiving and handling classified documents given to them by government officials.
 
 
 3
 The documents that are the focus of this prosecution were internal budgeting and planning documents that the DOD used to reach decisions on its funding priorities. Some of the documents involved flowed directly from the Secretary of Defense and his Deputy to the secretaries of the military departments, and described the goals to be achieved by DOD. Other documents came from the military departments and were created in response to the Secretary's directive; these documents outlined how each department would allocate its resources. Some documents reflected the debate going on within the Pentagon on budget priorities, while still other documents indicated the final decisions on budgets and program funding. As a consequence, these documents taken together afforded the reader a valuable look into the thought processes of the DOD on critical funding decisions.
 
 
 4
 Caso and Kiely were indicted for being part of a conspiracy to conduct an "underground market" in this sensitive information. At trial, the government established that the documents acquired or traded by Caso and Kiely were classified and that Caso and Kiely were not entitled to their possession. In addition, the parties stipulated that each document contained in substantial proportion pages marked "secret."
 
 
 5
 The government also introduced evidence that Caso and Kiely had ample notice that acquisition and transfer of the documents named in the indictment were internal DOD documents which were not released without authorization to defense contractors. Indeed, the documents themselves carried a number of warnings, such as "NOT RELEASABLE TO CONTRACTORS/CONSULTANTS" or "REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS PROHIBITED EXCEPT WITH THE PERMISSION OF THE ISSUING OFFICE" printed on the face of the document. In addition, through the ongoing security clearance process Caso and Kiely were frequently made aware of the unlawfulness of failing to follow government procedures on handling and distributing classified documents.
 
 
 6
 In their defense, Caso and Kiely largely acknowledged receiving these kinds of warnings. But they contend that they thought these warnings were inapplicable to them because they believed in good faith that the documents were lawfully provided to them as part of an "informal DOD policy" to put important budgeting documents in the hands of defense contractors. Against this claim the government offered substantial evidence at trial showing that Caso and Kiely and other members of the conspiracy knew they should not have the documents and that they took extraordinary steps to avoid detection.[1]
 
 
 7
 Defendants do not challenge the sufficiency of the evidence. Instead, they assign error to the district court's pretrial decision not to dismiss or strike a portion of the indictment; to the court's refusal to grant defendant Kiely discovery of a Navy budget document; and to the court's admitting evidence that rebutted Kiely's claim of withdrawal, as well as the jury instructions the court gave, or did not give, on a good faith defense. We take these assignments of error in turn.
 
 II
 
 8
 Caso and Kiely contend that the indictment on its fact was fatally flawed and should have been dismissed because it failed to state an offense or that it should have been dismissed for vagueness and lack of fair notice. They also contend alternatively that a portion of the indictment should have been stricken because it charged acts that were either the "result of" the conspiracy or were acts of concealment, but were not in furtherance of the conspiracy. The trial court denied these motions. We find no error in their denial.
 
 
 9
 * In assessing whether an indictment should be dismissed for vagueness, the indictment is read in the light most favorable to the government, and the well-established test is whether it was sufficiently detailed in the facts alleged and offense charged necessary to give defendants notice so as to meet double jeopardy concerns. Hamling v. United States, 418 U.S. 87 (1974). Read in this light, and guided by "practical, not technical, considerations," United States v. Morano, 697 F.2d 923, 927 (11th Cir.1983), the indictment at issue passes muster.
 
 
 10
 We start with the offense as defined by statute. Section 371 makes it a crime
 
 
 11
 [i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy....
 
 
 12
 18 U.S.C. Sec. 371. The "defraud" portion of Sec. 371 extends to any conspiracy to obstruct a lawful government function. Dennis v. United States, 384 U.S. 855, 861 (1966); see also McNally v. United States, 483 U.S. 350, 358 n. 8 (1987) ("defraud" in Sec. 371 distinguished from "defraud" in Sec. 1343; "defraud" in Sec. 371 "also means to interfere with or obstruct one of its lawful government functions by deceit, craft or trickery, or at least by means that are dishonest."). Consequently, an indictment charging conspiracy to defraud under Sec. 371 is not overly vague if it avers an agreement to obstruct a legitimate government function and knowing and willful participation in the conspiracy, and lists overt acts committed in furtherance of the conspiracy. United States v. Gordon, 780 F.2d 1165, 1170 (5th Cir.1986); see also United States v. Rosengarten, 857 F.2d 76, 78-79 (2d Cir.1988) (Sec. 371 violation may be predicated upon conspiracy to impair, obstruct, or defeat lawful function of any governmental department). An indictment charging conspiracy to commit an offense against the United States, in this case a violation of 18 U.S.C. Sec. 641, must state that the defendant conspired knowingly and willfully to convey or convert government property without authority, and that one of the conspirators took an overt act in furtherance of the conspiracy.
 
 
 13
 In this case, the 64-page indictment recounts in great detail the particulars of the fraudulent scheme. Maintaining a system of classified documents obviously is a legitimate function of government. See United States v. Zettl, 889 F.2d 51, 53 (4th Cir.1989); cf. United States v. Walker, 796 F.2d 43 (4th Cir.1986) (espionage prosecution for transferring classified DOD documents related to national defense). The overt acts enumerated in the indictment were sufficient to apprise defendants of facts upon which the conspiracy charge was based. See United States v. Lane, 765 F.2d 1376, 1380 (9th Cir.1985). In addition, such assertions, if believed, could support a finding that the defendants conspired to acquire and convey classified documents. See Jackson v. Virginia, 443 U.S. 307, 319 (1979) (one test of indictment is whether it was sufficient to allow a trier of fact to find the essential elements of the crime beyond a reasonable doubt). The indictment also detailed how the alleged conspiracy substantially impaired and impeded the DOD's system of maintaining classified documents. Finally, the indictment included a lengthy list of overt acts indicating that defendants acted with fraud and deceit in carrying out their activities. These allegations, if proven, could support a finding that the defendants acted willfully in violation of Sec. 371. Accordingly, we find the indictment not overly vague.
 
 
 14
 Defendants also challenge the indictment on the grounds that they did not have "fair notice" that their conduct was proscribed by law. It is of course basic that a person cannot be prosecuted for conduct which he could not reasonably understand to be proscribed, Bouie v. City of Columbia, 378 U.S. 347, 351 (1964), or conduct which he had no reason to suspect would subject him to prosecution. United States v. Ingredient Technology Corp., 698 F.2d 88, 96 (2d Cir.1983). On the other hand, the government is not obligated to point to a "litigated fact pattern directly on point." United States v. Mallas, 762 F.2d 361, 364 (4th Cir.1985) (quoting Ingredient Technology, 698 F.2d at 96).
 
 
 15
 Caso and Kiely had more than fair notice that the conduct charged to them was proscribed. From the first time they obtained their security clearances they were told of the rules on handling classified documents and the penalties for violating such rules. Kiely twice signed notices stating,
 
 
 16
 I shall not knowingly and willfully communicate, deliver, or transmit, in any manner, classified information to an unauthorized person or agency. I am informed that such improper disclosure may be punishable under Federal criminal statutes.... I have read, or have had read to me, the portions of the ... Federal criminal statutes relating to the safeguarding of classified information [including 18 U.S.C. Sec. 371].
 
 
 17
 J.A. at 19. Caso signed similar notices. There is also the unmistakable notice given by the documents themselves, some of which stated, "NOT RELEASABLE TO CONTRACTORS/CONSULTANTS," whereas others warned, "the DOD estimates contained in this issue will not be furnished to anyone outside the executive branch without ... express written consent...." J.A. at 38. Finally, defendants' multiple acts of petty deception further demonstrate that they knew their acts were prohibited.
 
 B
 
 18
 In addition to the vagueness and fair notice claims, defendants also contend that the indictment should have been dismissed for failure to state a claim. This contention has three parts, one challenging the existence of any allegation that defendants owed a duty to the government, one contending that 18 U.S.C. Sec. 641 cannot serve as a basis for a conspiracy prosecution in this context, and one attacking a number of the overt acts in the indictment which bring appellants' activity within the statute of limitations.
 
 
 19
 With respect to the first claim, defendants are right that courts have required under Sec. 371 evidence of some duty running from the defendant to the government. See, e.g., United States v. Tuohey, 867 F.2d 534, 538 (9th Cir.1989). However, the indictment is sufficient in this regard. It states that both defendants had security clearances, which entailed a promise to follow promulgated DOD procedures on handling classified documents. Furthermore, the indictment details how some of the documents had express warnings that the document did not belong in the hands of defense contractors. This suffices to charge the existence of duty.
 
 
 20
 The argument raised by appellants that this duty did not fall on them because the DOD Directives on classified documents applied only to DOD employees proves too much. As the government points out, that would mean a person off the street could distribute without fear of prosecution documents that were plainly marked "secret" and which he knew were classified and which he knew did not belong to him. That cannot be right. As we suggested in United States v. Mallas, 762 F.2d at 364, at some point "the authoritative force of common sense" would compel finding of such a duty. Here, however, there is more. Unlike Mallas, which involved a prosecution based on an unsubstantiated theory of tax law and in which this court could find no "regulation, judicial decision, or even revenue ruling" to support the government's position, id., here there is ample notice in DOD's Industrial Security Manuals and other sources that classified documents are not baseball cards, they cannot be bought and traded at the whim of the buyer.
 
 
 21
 Defendants next contend that Sec. 641 cannot be used as a basis for an indictment for conspiracy to commit an offense against the United States, since the property involved is classified material, and Sec. 641's element of "without authority" is unconstitutionally vague. These arguments lack merit.
 
 
 22
 We find it hard to conjure up a reason why Sec. 641 should not apply to classified documents. The statute makes it a felony to convey "any record, voucher, money or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof" where the value of such property exceeds $100. 18 U.S.C. Sec. 641. It is hard to imagine "any record" more valuable to the United States than its classified documents. There is no reason to exclude the most sensitive records in the United States' files from this statute. Any argument defendants may have had about the nonapplicability of Sec. 641 to government classified information, based on the premise that the information is not necessarily worth over $100, was rejected by our holding in United States v. Fowler, --- F.2d ----, ----, No. 90-5607, slip op. at 5-6 (4th Cir. Apr. 29, 1991). Building on the reasoning of the Supreme Court in Carpenter v. United States, 484 U.S. 19, 25 (1987) (intangible nature of a newspaper's confidential business information did not "make it any less 'property' protected by the mail and wire fraud statutes"), we held in Fowler that "Sec. 641 would apply because information is a species of property and a thing of value." Fowler, --- F.2d at ----, slip op. at 6. In this we joined the Second and Sixth Circuits in holding that conversion and conveyance of governmental information can violate Sec. 641. See United States v. Jeter, 775 F.2d 670, 680-82 (6th Cir.1985); United States v. Girard, 601 F.2d 69, 70-71 (2d Cir.1979).
 
 
 23
 Finally, defendants contend that "without authority," which is an element of a Sec. 641 violation, is unconstitutionally vague. See 18 U.S.C. Sec. 641 (a crime is committed when a person "without authority, sells, conveys, or disposes" of government property). We disagree. A number of courts have held that "authority to sell or convey" government property gives defendants adequate notice of what kind of property they can convey and under what circumstances. See Jeter, 775 F.2d at 682. We hold that "authority" is a knowable term--it suggests actual permission from someone who has the legal capacity to give permission. Hence, the district court's decision as to these challenges to the indictment is affirmed.
 
 III
 
 24
 Defendants assign error to the district court's decision not to strike a portion of the overt acts enumerated in the indictment. The indictment charged over one hundred and twenty-five overt acts in furtherance of the conspiracy to defraud the government. A portion of the series of enumerated overt acts pertains to the fact that defendants "retained until destruction" a number of classified documents. The indictment also charged that defendants acted to conceal their classified documents from DOD investigators. Before trial defendants moved to strike these portions of the indictment, arguing that retention of the documents was a "result of" and not in furtherance of the conspiracy, and that the acts of concealment came after the conspiracy had ended. The district court rejected these motions, and we affirm.
 
 
 25
 * The conspiracy engaged in by Caso and Kiely and proved by the government operated through an underground network whereby one defense contractor obtained the critical budget documents, made a copy, then kept one copy and passed another on to a friend or colleague. After the documents were obtained they served as a resource to the defense contractor in doing business with the government. In this environment, it made little sense to throw out the documents. It is reasonable to conclude that these documents were obtained illegally so that they could be held and used by the defendants. Consequently, we hold that one of the objects of the conspiracy was the illegal retention and illegal use of the illegally procured documents.
 
 
 26
 It is important to realize that retention of the documents made the conspiracy work, and enabled the conspiracy to operate at will. Caso put the documents in the Hughes control system under false titles, with false sources, so that they could be used and retained and not discovered. Similarly at Raytheon, Kiely hid the documents in the computer system and kept them so that they could be passed on later to other defense contractors, usually in exchange for even more classified documents. In this way, classified documents were the coin of the realm, and the use of the coins was what the conspiracy was all about.
 
 
 27
 The object of the conspiracy was thus to obtain and keep the documents for the future illegal use by the defendant and his company, and for future trading value. In this way, the facts at issue here are distinguishable from a case relied on by appellants, United States v. Doherty, 867 F.2d 47 (1st Cir.1989). Doherty involved police officers who conspired to steal and sell promotional examinations. The First Circuit faced the question whether the act by the officers of cashing their paychecks from their promoted positions was an act in furtherance of the conspiracy or was a "result of" the conspiracy. In holding that cashing paychecks was merely a result of the conspiracy, the Doherty court held
 
 
 28
 [W]here receiving the payoff [from the conspiracy] merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, ... and there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues. Rather, in these latter circumstances, one would ordinarily view the receipt of payments merely as the "result" of the conspiracy.
 
 
 29
 867 F.2d at 61 (emphasis in original).
 
 
 30
 By contrast, the instant case involves repeated unlawful activity: every time defendants made use of the documents concealed and falsified in their company's document control system, they took additional actions that were proscribed by DOD rules and regulations and punishable by criminal law. See J.A. at 512-13 (portions of DOD Industrial Security Manual detailing proper procedures in handling classified information); see also id. (Kiely's acknowledgement that willful and knowing disregard of security regulations may be punishable under federal statutes); id. at 516 (a 1978 company report informing Caso that he violated DOD's Industrial Security Program by receiving, reproducing, and storing sensitive classified information). Therefore, we are not dealing here with "a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions[.]" Instead, we are faced with discrete actions of limited duration, from the time the documents were acquired until the budget documents were no longer useful, and were destroyed. Moreover, the actions here are un ordinary and unlawful--very different than cashing a paycheck. That the defendants' activity was out of the ordinary, and violative of DOD rules, is demonstrated by the extensive and extraordinary steps Caso and Kiely took to conceal these documents.
 
 
 31
 The Doherty court also focused on whether evidence exists that the "special dangers" of concerted activity and group association to achieve criminal ends remain present. 867 F.2d at 61. In that case, when the exam was over and the promotions illegally obtained, the danger of concerted activity by the illegally promoted police officers was not present. That contrasts sharply with the conspiracy here that included Caso and Kiely among others. Here the danger of concerted activity remained present as long as the illegally obtained documents remained useful and the infrastructure of the underground market remained in place. At any point, the defrauding of the government could begin anew whenever one of the defendants decided he wanted to trade from his storehouse of illegal documents for one in the hands of a co-conspirator. In addition, Caso and Kiely needed each other to cooperate in the falsification and concealment in order to make the documents useful. Consequently, the danger of concerted activity remained present, and that, along with the unordinary and unlawful activity described above, convinces us that the overt acts were in furtherance of, and not just the result of, the conspiracy. Cf. United States v. Girard, 744 F.2d 1170, 1172-73 (5th Cir.1984) (bid rigging conspiracy went beyond awarding of contract, lasted until final payment made); United States v. Helmich, 704 F.2d 547, 549 (11th Cir.1983) (conspiracy to transfer secret information lasted 17 years after last act of transfer, until final payment was made); United States v. Mennuti, 679 F.2d 1032, 1035-36 (2d Cir.1982) (arson conspiracy lasted after fire until conspirator received his payoff, which was to purchase torched property); United States v. Walker, 653 F.2d 1343, 1348-50 (9th Cir.1981) (fraudulent contract conspiracy lasted until conspirators divided up profits).
 
 B
 
 32
 In addition to arguing that a number of the overt acts listed under "retention until destruction" should have been stricken, defendants also contend that the district court erred when it failed to strike that portion of the indictment that charged three overt acts committed in 1986 in which Caso and Kiely gave false statements to DOD investigators. Appellants contend that these were acts of concealment which took place after the central objectives of the conspiracy, the obtaining and retention of the documents, were achieved.
 
 
 33
 The test to be applied here comes from Grunewald v. United States, 353 U.S. 391 (1957), and its basic teaching is that courts should not infer a subsidiary conspiracy to conceal once the essential purpose of the conspiracy has been achieved. The reason is that otherwise the conspiracy would be never ending, since virtually all misdeeds require some subsequent acts to keep them secret. However, Grunewald also teaches that there is a distinction between concealment acts and acts which are necessary to the successful accomplishment of the crime. 353 U.S. at 405. This last distinction frequently turns on the proximity of the concealment acts to the core of the conspiracy, i.e., there is a difference between concealment acts committed one hour after the object of the conspiracy has been achieved and one year later.
 
 
 34
 Because we hold that one object of the conspiracy was to retain the documents for their use, then the conspiracy was still alive when the acts of concealment took place. Indeed, the evidence shows that the concealment steps were absolutely necessary because the investigation of defense contractors by the United States Attorney was in full cry, and that but for the concealment the documents that were being used would have been uncovered and the object of the conspiracy, to retain and use the "secret" budget documents, would have been frustrated. Accordingly, we affirm the ruling of the district court to deny the motion to dismiss the indictment.
 
 IV
 
 35
 Defendant Kiely contends that his defense impermissibly suffered because the district court denied his motion to discover a Navy budget document. Kiely considered this document critical because part of his alleged illegal conduct included taking material out of a classified document and placing it in an unclassified memorandum. The defense wanted the document to show that a portion of the Navy's budget document included unclassified material and that his memorandum only drew from that portion of the Navy budget document.
 
 
 36
 In reviewing whether the district court erred in denying the discovery motion, the standard is abuse of discretion. United State v. Nixon, 418 U.S. 683, 702 (1974); United States v. Tindle, 808 F.2d 319, 323 (4th Cir.1986). In this case, the district court permitted discovery against the government to be far reaching. Entire forests of paper were turned over by the government. Of course, quantity does not make quality. But Kiely's motion for additional discovery was made just five days before trial was to begin. In addition, the overt act that Kiely was trying to disprove, the redacting of information from a classified document, was a small portion of a very large case. Moreover, and we find this telling, the Navy document was not one that a defense contractor could lawfully acquire or convey, whether it was sprinkled with unclassified information or not. Given this, we cannot find that the district court abused its discretion in denying the discovery motion.
 
 V
 
 37
 The final errors assigned by defendants go to the trial court's decision to admit government evidence rebutting Kiely's claim of withdrawal, and to the jury instructions given by the court. With respect to the first, Kiely argues that this evidence should have been excluded and that had it been then the trial court would have granted his motion for judgment of acquittal. As to the jury charge, both defendants assign error that the jury charge did not include a good faith instruction.
 
 
 38
 * Kiely's position at trial was that if there was a conspiracy he withdrew from it five years and one day before being indicted. If a defendant produces evidence of withdrawal, then the burden shifts to the government to prove beyond a reasonable doubt that the defendant did not withdraw. United States v. West, 877 F.2d 281, 289 (4th Cir.1989). Kiely produced some evidence: he alleged that at a trade show on March 20, 1985 (5 years and one day before indictment), he read a newspaper account of an investigation of defense contractors and then announced that he was quitting the document game. As a result of this testimony, it fell upon the government to rebut this claim of withdrawal.
 
 
 39
 In trying to meet this burden the government produced John Domalski, who was a fellow market researcher for a defense contractor, Ford Aerospace. Domalski testified that he asked Kiely around the same time as the purported withdrawal, at the same trade show, where Domalski could get "data that were available to market researchers in our business." According to Domalski, some two weeks later he went up to see Kiely in Bedford, Massachusetts at Raytheon's plant, carrying with him a "confidential" document because he wanted to have a document to trade with Kiely. During that visit, Domalski asserted, Kiely made available to Domalski his extensive library of "secret" and "confidential" documents, many of which were properly obtained. During his review of these documents Domalski saw the document he had brought for trade bait, and he therefore made no offer of that document. However, he asked for certain classified documents, and Kiely agreed to provide them to Domalski by copying them and mailing them to Domalski's home, in contravention of DOD procedures for handling classified documents. Ford Aerospace, Domalski's employer, considered this an "improper shipment" under the security regulations. The government contends that this episode mirrors earlier exchanges and indicates that the conspiracy continued after the alleged withdrawal.
 
 
 40
 The problem with the government's position, says the defendant, is that this act was not charged in the indictment. However, the government is not limited to overt acts pleaded in the indictment in proving the existence and duration of a conspiracy, but may show other acts consistent with the conspiracy that occurred during its existence. See United States v. Gold, 743 F.2d 800, 813 (11th Cir.1984) ("[A] variance exists where the evidence at trial proves facts different from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations.") Moreover, we find defendant Kiely's contention of less significance when, as here, the testimony was offered in rebuttal of defendant's claim that he withdrew from the conspiracy. Also, the government had other overt acts, namely the "retention until destruction" of the documents, that indicate the conspiracy continued within the statute of limitations. Proof of the Domalski-Kiely encounter thus was not necessary to the prosecution until the issue of withdrawal was raised by Kiely. Once faced with that burden, the government could rely on additional evidence not included in the indictment. See id.; United States v. Lewis, 759 F.2d 1316, 1344 (8th Cir.1985) (government not limited in conspiracy cases in its proof to overt acts enumerated in indictment).
 
 B
 
 41
 Finally, defendants challenge the jury instructions given by the court regarding authorization, good faith, and conspiracy. The district court's jury instructions are reviewed "as a whole" to determine whether they fairly summarized applicable law. United States v. Snyder, 766 F.2d 167, 170 (4th Cir.1985).
 
 
 42
 Caso and Kiely were charged with conspiracy to convey "without authorization" government documents, a violation of 18 U.S.C. Sec. 641. One of the theories advanced by defendants in their opening and closing argument and supported by some of their evidence is that defendants got these documents as part of an "informal DOD policy" to place sensitive but helpful budget documents in the influential hands of defense contractors. Accordingly, appellants requested a jury instruction on "actual unofficial authorization." The trial court refused to give the requested instruction because it found that "unofficial authorization" was legally insufficient. We agree. See Zettl, 889 F.2d at 53 (court found that decision to grant authorization "is a function of the government and its system of accountability for classified documents, not of someone who just happens to be in possession thereof, whether or not he rightfully possesses the document.").
 
 
 43
 Based on this reasoning, the court instructed the jury:
 
 
 44
 The term without authority means the conveyance was made without the permission and consent of a Government official who is actually authorized to give that consent. In other words, it would not be enough that the defendant had the consent of a Government employee unless that employee had the actual authority to give the defendant permission and consent to convey the document.
 
 
 45
 J.A. at 398k. Later in the instructions, however, the trial court added a statement which focused the jury on the knowledge and willful elements of the statute:
 
 
 46
 It is not enough, however, for the Government to prove that the conveyance was without authority. The Government must also prove that the defendant either knew that the conveyance was without legal authority, or that the defendant acted with reckless disregard as to whether the conveyance was authorized.
 
 
 47
 * * *
 
 
 48
 * * *
 
 
 49
 The word knowingly is added to insure that no one will be convicted in this Court or any other Court because of some mistake or accident or other innocent reason on the part of the defendant.
 
 
 50
 * * *
 
 
 51
 * * *
 
 
 52
 [Y]ou may infer the defendant acted knowingly if you conclude that the defendant had a conscious purpose as opposed to negligence or mistake to avoid learning an existing fact. That you may infer this however does not relieve the Government of the duty to or the obligation to prove both that the defendant acted knowingly and willfully by proof beyond a reasonable doubt.
 
 
 53
 J.A. at 398k-981, 398m-98n, 398n.
 
 
 54
 Though the court did not give defendants their requested instruction on an "unofficial" authorization, a ruling we affirm, the instruction made clear that defendants had to have the requisite scienter as to authorization. As a result, Caso and Kiely could not be convicted for negligently not having actual authorization, nor for reasonably thinking they had actual authorization.
 
 
 55
 We find the instruction before us indistinguisable from one which this court recently upheld in Fowler, --- F.2d ----, No. 90-5607 (4th Cir.Apr. 29, 1991). In Fowler, we held that a similar instruction, given in a case involving a co-conspirator of Caso's and Kiely's, "specifically told the jury that [defendant] could not be convicted because of negligence[.]" Id. at ____, slip op. at 23. Similarly under the present instruction, defendants could only be convicted if they knew or consciously avoided evidence that they lacked actual authorization. We find this instruction adequately states the law and protects a defendant who reasonably believes he acted "with authority." This instruction also is consistent with our holding in United States v. Biggs, 761 F.2d 184, 188 (4th Cir.1985), in which we approved an instruction on reckless disregard when it was stated in terms of "conscious avoidance." See also United States v. Hester, 880 F.2d 799, 802 (4th Cir.1989) (reckless disregard equated with knowledge where disregard was deliberate and reflects a conscious purpose to avoid learning the truth). Consequently, in accord with United States v. Fowler, we uphold the instruction as a fair statement of the law.
 
 
 56
 Defendants also challenge the jury instruction because it did not, they contend, contain an adequate instruction on good faith. The court refused to give the good faith instruction requested by defendant on the conspiracy to defraud under 18 U.S.C. Sec. 371, since the court held that good faith was not a defense. On the conspiracy to convey without authorization, the court gave the instruction on "without authority" set forth above, and added:
 
 
 57
 It is a defense to a charge of conspiracy to convey without authority that the defendant either had actual authority or that he believed he had authority, and that this belief was reasonable under all of the circumstances.
 
 
 58
 J.A. at 3981-98m. From this defendants contend that no good faith instruction was given on defrauding the government, and that the instruction on the unauthorized conveyance was insufficient.
 
 
 59
 This contention can be tackled in two ways. First, a fair reading of the jury instruction reveals that the court's statement, that the defendants could be convicted only if the jury found that they acted willfully and knew they did not have authorization for the conveyance, applies with full force to all the offenses charged. That is because the heart of the alleged illegal conduct was that defendants obtained documents from others and gave to others classified documents. Thus, the conspiracy to defraud the government by compromising its classified document system necessarily involves conveying of documents. In this way, the court's instruction that the conveyance must have been done willfully and with knowledge or reckless disregard logically carries over, for the jury, to the other objects of the conspiracy.
 
 
 60
 More fundamentally, however, we do not see a good faith instruction as warranted. The very concept of good faith is either incompatible with a "willful" or "knowledge" instruction, or is subsumed by those instructions. We believe it axiomatic that a defendant cannot act with "a purpose to disobey the law" and yet "believe[ ] in good faith that his actions were legal"--the former being the actual jury instruction and the latter being the instruction sought by defendants. Consequently, at one level the so-called good faith defense is logically and legally incompatible with a standard instruction on willful conduct. At another level, the so-called good faith instruction is subsumed in the charge that a defendant cannot be convicted unless the jury finds that he acted with "purpose to disobey or disregard the law." If the jury found the defendant reasonably believed that he was not breaking the law, then the jury would have to find that he necessarily lacked the "purpose to disobey the law." Hence, the instruction sought would have been superfluous, since it is contained within the "willful" instruction.
 
 
 61
 For these reasons, we hold that the instruction given by the court gave defendants all they are entitled to--from it, they could argue, as they in fact did, that they in good faith thought they had authorization for the documents. It was for the jury then to decide whom to believe.
 
 
 62
 AFFIRMED.
 
 
 
 [1]
 Defendants falsely entered the name and source of these documents in their company's document control system; they removed the "secret" and "confidential" markings that were stamped at the top of every page; they maintained separate mail boxes to receive documents; they mailed "secret" documents to fellow defense contractor researchers at home; they took elaborate steps to hide the documents when their company's offices were inspected by DOD investigators; and they exchanged the documents in surreptitious ways, using unmarked envelopes and exchanging them anywhere but the office. All of this activity was in violation of DOD procedures and federal law on handling and access to classified documents. See J.A. at 512-13 (portions of DOD's Industrial Security Manual)