UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

No. 09-4487
(1:08-cr-00144-RDB-1)

—————————

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

HENRY COLE,

             Defendant - Appellant.

—————————

O R D E R

—————————

       The Court amends its opinion filed January 21, 2011,
as follows:

       On page 16, line 2 -- the word "denotations" is
corrected to read "donations."

                            For the Court – By Direction


                            /s/ Patricia S. Connor
                                    Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 09-4487

HENRY COLE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:08-cr-00144-RDB-1)

Argued: October 29, 2010

Decided: January 21, 2011

Before NIEMEYER, DAVIS, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Niemeyer and Judge Wynn joined.

## COUNSEL

**ARGUED**: Steven M. Klepper, KRAMON & GRAHAM, PA, Baltimore, Maryland, for Appellant. Joyce Kallam McDonald, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Andrew Jay Graham, Max H. Lauten, KRAMON & GRA-

HAM, PA, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, A. David Copperthite, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

DAVIS, Circuit Judge:

Henry Cole appeals his convictions for filing false tax returns in violation of 26 U.S.C. § 7206(1) and evading taxes in violation of 26 U.S.C. § 7201. Cole, a real estate agent and investor, agreed with several others to purchase commercial properties in the Baltimore metropolitan area. Without his co-venturers' knowledge, Cole secretly negotiated with the sellers of each property to increase the purchase price. He then arranged to have the difference ($2 million in the aggregate) paid to an entity only he controlled. He paid no income tax on this bounty. A jury accepted the Government's theory of the prosecution and rejected Cole's innocent version of his acts and omissions, which he vigorously supported with documentary evidence and witness testimony (including his own and that of his expert accountant, among others). On appeal, Cole asks us to overturn his convictions, principally on the ground that the proper tax treatment of the $2 million was ambiguous as a matter of law, rendering proof of his willfulness a legal impossibility. He also assigns error to the district court's admission of certain evidence and its denial of a continuance. We affirm.

I.

This prosecution for tax offenses arose from Cole's promotion of real estate investment partnerships in connection with which he clandestinely extracted commissions that he reported on his tax returns as capital gains offset by capital losses. We summarize the facts in the light most favorably to

the Government's theory of the case and consistent with the jury's verdict.

A.

Cole was a real estate agent at the O'Conor, Piper & Flynn real estate brokerage (later consolidated into Coldwell Banker) ("OPF"). He also invested in real estate. As relevant to this case, Cole partnered with three doctors to purchase five office buildings during the period 2001 to 2003. Prior to the first disputed purchase, there existed a two-person partnership between Cole and Dr. David Miller. Dr. Miller testified as a witness for the defense that he had long had an understanding with Cole that Cole, who was to serve as the property manager for any of their purchased investments, would take "a 10% profit up front . . . on any building that he bought or sold." J.A. 635-36. Dr. Stanley Friedler, a friend of Dr. Miller's, paid a premium to buy into the venture in 2001. Shortly thereafter, Dr. Friedler solicited the participation of his friend, Dr. Selvin Passen, who invested in subsequent deals.

Drs. Friedler and Passen contradicted Dr. Miller's apparently favorable view of Cole's business methods. Each testified for the prosecution, attesting to his understanding that the co-venturers had agreed to make equal capital contributions toward the purchase of commercial properties in return for equal returns, and that Cole specifically promised not to take a commission (over and above the customary broker commissions paid to OPF, which OPF shared with Cole) for finding and negotiating deals.

In each of the five transactions presented at trial, after Cole had negotiated a purchase price with the seller on behalf of the specific co-venture, he asked the seller to increase the price by several hundred thousand dollars (ranging from $250,000 to $600,000). He then arranged, with one exception,

to have funds representing the agreed increase paid at closing to an entity he controlled, B&N Realty.[1]

The evidence of the contemporaneous treatment of the increased payments as commissions was substantial. First, the agreed increases in the sales prices of the investments, which totaled $2 million, were designated as commissions in the sales contracts, though several of the sellers testified that they were quite high for commissions. Second, Cole told Carol Wildesen, Esq., OPF's in-house settlement attorney who oversaw the disbursement of funds generated by the transactions, and John Evans, the OPF partner who oversaw sales associates, that they were commissions. Third, the checks Wildesen issued to Cole were labeled as commissions (as were the descriptions appearing in certain internal OPF documents). Fourth, in the course of civil litigation in 2006 between Friedler and Passen, on the one hand, and Cole on the other hand, Cole stated under oath that the disputed payments were commissions. J.A. 1128 ("[T]he commission and fees received by Cole were not material to Passen's and Friedler's decisions to invest in the properties [as] the commissions and fees were *paid by the sellers, not the investors*." (emphasis added)).[2]

---

[1]Payment was made to B&N Realty in all but the fifth, final transaction. Counsel to the seller in the fifth transaction objected to Cole's request, citing concerns that B&N was in no way connected to the transaction. Instead, the seller paid the increased amount directly into the purchasers' partnership account and Cole subsequently directed the partnership's bookkeeper to issue a check to him, which Cole then deposited into his personal account. Cole complains on appeal that the Government improperly referred to this withdrawal of funds from the partnership account as an "embezzlement." We discern no reversible error in this regard.

[2]To be sure, during the tax years at issue, Cole earned significant commission income (apparently close to or exceeding a quarter of a million dollars in each year) as a real estate agent and he appropriately reported such earnings on his belatedly-filed tax returns. The gist of the prosecution's theory of this case was that Cole tried to disguise additional commission income, i.e., ordinary income, generated by his negotiation of increased sales prices for the co-venturers' real estate investments, as "assignment fees," i.e., capital gains.

Cole had attorney Wildesen prepare separate settlement reports for the buyers and sellers in the subject transactions, a practice Wildesen testified was unusual. The payments to B&N Realty (Cole's alter ego) were listed only on the sellers' settlement reports. Friedler and Passen testified that they were wholly unaware of the secret payments to Cole. Indeed, Friedler testified that Cole urged him not to attend the settlement for the first property in which he invested.

Each of the sales contracts negotiated by Cole identified the buyer as "Henry Cole and/or assigns." Nevertheless, each of the sellers testified that Cole told them he was purchasing the buildings not just for himself, but also as an agent for his physician/co-venturers. The down payments were all paid with partnership funds or with checks written directly by the doctors or their spouses, and one of the buildings was financed in part by a $1 million note personally guaranteed by Cole, Miller, and Friedler.[3]

In addition to the transactions summarized above, Cole arranged during the 2003 tax year for Dr. Passen's children to buy at a discount the $1 million note financing the third property. Passen testified that Cole was not to receive a commission on the purchase and sale of the note. Nonetheless, the evidence at trial showed that the seller sold the note for $98,200 less than Cole received from Passen's children, and Cole pocketed the difference.

---

[3]The down payments for the first three properties came from partnership accounts, to which the doctors had contributed hundreds of thousands of dollars, and the third building was financed, in part, by a $1 million note guaranteed by Cole, Miller, and Friedler. The down payment on the fourth property was funded entirely by Passen and Friedler. The down payment on the fifth and final purchase was raised through a $75,000 check from Friedler directly to OPF and monies taken from the management entity related to the fourth property. It appears to be undisputed that Cole contributed little, if any, capital to any of the ventures.

### B.

In April 2005, having learned a few months earlier of the Government's criminal investigation, Cole filed tax returns for the years 2001, 2002, and 2003, reporting no taxable income for each year. He had his accountant characterize the $2 million in payments he received in the transactions summarized above as "assignment fees" earned from the sale of his contractual right to make the purchases individually, and thus capital gains rather than ordinary income. In this fashion, he was able to offset completely the short-term capital gains income in each year with carry-forward losses. He entirely failed to report the $98,200 he received for arranging the sale of the $1 million note to Passen's children; he testified at trial that he "missed it" due to a bookkeeping error. J.A. 851. He did report approximately $15,000 of self-employment tax each year, though by the time of trial he had never paid the taxes.

### C.

A grand jury issued a superseding indictment in September 2008 charging Cole in six counts: three counts for willfully filing false tax returns for tax years 2001, 2002, and 2003, in violation of 26 U.S.C. § 7206(1), and three counts for evading income taxes in the same years in violation of 26 U.S.C. § 7201. The indictment charged that, *inter alia*, Cole falsely claimed $2 million of ordinary income as capital gains.

### D.

As mentioned above, to justify characterizing the $2 million as capital gains, Cole argued at trial that the amounts were proceeds from the assignment of the sales contracts to his co-venturers. Cole's expert accountant, James Wilhelm, testified that he believed the "underlying economics" of the transactions justified their treatment as assignments, J.A. 689, though he admitted that the sale of a contract would require

(at minimum) that the buyer knew he was purchasing the contract rights. The Government, eliciting the above testimony from Friedler and Passen that they were unaware of the funds paid to Cole, citing the "commission" labels used in the relevant documents, and adverting to the totality of the direct and circumstantial evidence of Cole's suspicious methods, argued that the payments were disguised commissions, i.e., ordinary income and not capital gains.

Over Cole's objection, the trial court admitted into evidence three forms Cole had submitted to the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") in 1996 and 1998 in order to purchase firearms. The forms asked if the applicant was "an unlawful user of, or addicted to . . . any . . . narcotic drug, or any other controlled substance," and Cole answered "No" on each. J.A. 1359-60, 1362. But, as Cole stipulated at trial, he was "addicted to narcotic pain medication at the time he purchased the[se] firearms," and "prior to the purchase of the firearms, [he] had self-admitted to a hospital for drug addiction and was subsequently re-admitted for drug addiction treatment between 1996 and 1998." J.A. 308. The Government also proffered evidence that Cole plead guilty in 2001 to possessing those firearms while "an unlawful user of or addicted to any controlled substance" in violation of 21 U.S.C. § 922(g)(3), but the trial court sustained Cole's objection to admission of the conviction.

The district court also admitted evidence of Cole's "lavish spending" during the 2001-03 tax years and in subsequent years of non-reporting. Cole objected that the evidence was irrelevant because he would have had enough money to cover his lifestyle expenses even had he paid the taxes the Government alleged were due but unpaid. The trial court admitted the evidence, finding it relevant to Cole's motive to commit the tax offenses.

In a special verdict form the jury largely adopted the Government's theory of the case, although it declined to find that

Cole had fraudulently claimed charitable deductions and business expenses. Ultimately, the jury found Cole guilty on all six counts for willfully mischaracterizing the $2 million as capital gains each year and failing to report the $98,200 in income from the sale of the $1 million note.

The material facts concerning Cole's health at the time he was denied a continuance are set out in Part IV.

## II.

Cole was convicted under 26 U.S.C. § 7201, which makes it a crime to "willfully attempt[ ] in any manner to evade or defeat any tax imposed by [Title 26] or the payment thereof," and 26 U.S.C. § 7206(1), which reaches one who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter."

Cole contends that the district court erred in denying his motion for judgment of acquittal. In this regard, he principally asserts that the proper characterization of the $2 million was uncertain as a matter of tax law and thus, under controlling precedent, he was incapable of achieving the mental state required under the statute, "willfulness," as a matter of law. Questions of both the legal sufficiency of evidence to sustain a conviction and of tax law uncertainty are questions of law subject to *de novo* review. *See United States v. Gallimore*, 247 F.3d 134, 136 (4th Cir. 2001); *United States v. Mallas*, 762 F.2d 361, 364 n.4 (4th Cir. 1985).

Having closely examined Cole's contentions, we conclude that because the two cases Cole relies on, *United States v. Critzer*, 498 F.2d 1160 (4th Cir. 1974), and *Mallas*, speak only to *legal*, not to *factual*, uncertainty in the treatment of

income under federal tax law, they are wholly inapposite to this case and Cole's argument is wholly without merit.

*Critzer* concerned the failure to report income from improvements on land within the Eastern Cherokee Reservation, which generated a tax law question "so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions," 498 F.2d at 1162. That is, despite the defendant's prosecution by the Department of Justice, the Department of the Interior continued to maintain that the income was not taxable. *Id.* at 1161-62. Likewise, *Mallas* concerned "novel questions of tax liability to which governing law offer[ed] no clear guidance," 762 F.2d at 361, arising from a complex tax shelter that the Government claimed was illegal, *id.* at 362-63. We reversed the convictions, finding that "present authority in support of the [Government's] theory is far too tenuous and competing interpretations of the applicable law far too reasonable to justify these convictions." *Id.* at 363. We particularly emphasized that, as the Government conceded, the relevant Treasury regulation simply "does not address the issue." *Id.* at 364.

The instant case presented no "novel questions of tax liability to which governing law offers no clear guidance." *Mallas*, 762 F.2d at 361. Rather, the jury here confronted a straightforward question of fact: did Cole sell the sales contracts to his partners for an aggregate of $2 million, or was that amount simply the sum of purloined (the Government says, as to the fifth sale at least, "embezzled") funds Cole secretly extracted from the respective investment ventures?

Resolution of this question hinged not at all on the legal definition of "commission," "ordinary income," "capital gains," or on permissible methods of assignment, but rather on whether, *in fact*, the elements of a sale of capital assets were present. Most importantly, the jury was tasked with determining whether the doctors, the alleged buyers of these contracts, *knew they were purchasing them from Cole*. In sum,

because the "ambiguity" urged by Cole is a quintessential question of fact, it was properly left to the jury to decide, based on the evidence presented, whether the funds Cole generated for himself were properly treated as ordinary income or capital gains. Plainly, the jury did not entertain a reasonable doubt as to the Government's proof of the negative: that Cole was not engaged in a sale of capital assets to his co-venturers who already owned an interest in the assets by virtue of their payment of the down payments needed to acquire the assets in the first place.

As a distinct strand of his contention, Cole argues that the favorable testimony of his expert accountant, Wilhelm, should foreclose conviction under either statute as a matter of law. At trial, Wilhelm insisted that the payments were correctly characterized as "assignment fees," and he persisted in this view even after he learned that Cole had not contributed to the down payments and had a zero basis in many of the contracts. Cole makes the odd contention that the Government's failure to object to this testimony under Federal Rule of Evidence 702 operated as a concession that the testimony met the rule's strictures, and thus that Wilhelm's opinion was "based upon sufficient facts," was "the product of reliable principles and methods," and that Wilhelm "applied the principles and methods reliably to the facts of the case." *See* Fed. R. Evid. 702(1)-(3). Accordingly, Cole argues, the opinion of a single accountant, hired by a defendant, should suffice to establish the sort of legal uncertainty we found adequate to defeat a finding of willfulness in *Critzer* and *Mallas*. Indeed, Cole boldly invites us to "take this opportunity to announce a general rule that admissible Rule 702 evidence of actual correctness [of a tax characterization] precludes a finding of willfulness in tax prosecutions." Br. of Appellant, at 45. We decline this invitation.

Of course, even when an expert's methodology qualifies as "reliable" (and his testimony is thus admissible) for the purposes of Rule 702, the expert's resulting conclusions are by

no means unassailable.[4] Here Wilhelm's conclusion was predicated upon the fact of a sale of contract rights between Cole and his partners; Wilhelm himself conceded that a sale would at least require that the partners have been *aware* that they were purchasing Cole's rights. The jury was clearly entitled to find, as it did, that the Government's evidence conclusively negatived that possibility.

Finally, asking us to blink at the evidence of the repeated contemporaneous descriptions of the disputed payments as commissions, Cole contends that if we look to "the objective economic realities of [the] transaction rather than . . . the particular form the parties employed," *Boulware v. United States*, 552 U.S. 421, 429 (2008) (quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978)), we must find that the $2 million in payments were assignment fees, not commissions. We disagree. To excuse a party's attempted tax evasion by giving him the benefit of a different transactional structure he concocts *post factum* would be to turn *Frank Lyon* on its head. Here, where the jury could easily have found that Cole *could not* have structured these transactions as assignments because his partners did not know and would not have approved of Cole's inflating sales prices to capture solely for himself $2 million in income, this argument entirely lacks merit.

---

[4]As the district court correctly instructed the jury (without objection) when Wilhelm took the stand to testify:

> This witness will be qualified as an expert with respect to tax preparation and tax matters as a CPA. Just as I previously indicated, I think as to [the Government's expert], this is a time when a person has been qualified as an expert that they are permitted to give, he is permitted to give his opinion on a matter unlike other witnesses. *Again it's up to the jury to accept or reject any opinions that are presented.* But expert witnesses are permitted to give their opinions. Other witnesses are not. This gentleman has been qualified as an expert. So Mr. Wilhelm is allowed to give his opinion on certain federal tax matters.

J.A. 662 (brackets and emphasis added).

We readily conclude, therefore, that no complexity of tax law rendered Cole's prosecution untenable and that the jury's verdict finding beyond a reasonable doubt that Cole had willfully falsified the character of his income on his tax returns was amply supported by the evidence presented at trial. There was no error in the district court's denial of Cole's motion for judgment of acquittal.

### III.

Cole next argues that the trial court violated Federal Rule of Evidence 404(b) when it admitted evidence that he: (1) provided false answers on three forms filed with ATF in 1996 and 1998; and (2) engaged in lavish spending before and after filing the tax returns in question.

We review a trial court's rulings on the admissibility of evidence for abuse of discretion, and we will only overturn an evidentiary ruling that is "arbitrary and irrational." *United States v. Blake* 571 F.3d 331, 346 (4th Cir. 2009). To that end, we "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Udeozor*, 515 F.3d 260, 265 (4th Cir. 2008) (quoting *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990)).

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

As we recognized in *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997), this court has been less than consistent

in its application of Rule 404(b). But on the whole, "we have construed the exceptions to the inadmissibility of prior bad acts evidence broadly, and characterize Rule 404(b) as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Powers*, 59 F.3d 1460, 1464 (4th Cir. 1995) (internal quotation marks omitted). And we have set out a four-part test for prior-act evidence:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*United States v. Johnson*, 617 F.3d 286, 296-97 (4th Cir. 2010) (quoting *Queen*, 132 F.3d at 997). Parts (1)-(3) of the *Queen* test are requirements that must be satisfied for admission, but they also double as factors to be considered as probative value is weighed against unfair prejudice in the bundled Rule 403 analysis of part (4).

A.

Cole argues that the district court erred in admitting evidence that he falsely denied being an unlawful user of and addicted to controlled substances on 1996 and 1998 ATF forms he filed in order to purchase firearms. Cole argued that the ATF forms (and related testimonial evidence) should have been excluded as improper character evidence under Rule

404(b), but the district court held that, as the forms contained false statements made to an agency of the federal government, they were admissible because probative of "intent" and "absence of mistake" in this prosecution for tax offenses. The Government called Special Agent James Tanda, who introduced the three ATF forms, and Cole stipulated that at the time he completed the forms he was addicted to narcotic pain medication and had twice been treated as an in-patient for drug addiction. Immediately after the stipulation was read to the jury, the court gave a cautionary instruction.

In light of the four-part test announced in *Queen*, 132 F.3d at 997, we think that the propriety of the district court's admission of the ATF evidence is a very close question. It is doubtful that Cole's prior false statements are probative of any "absence of mistake" in causing his accountant to treat as capital gains ordinary income. After all, Cole's defense of "good faith" or "inherent ambiguity" turned mainly on whether he provided all of the relevant information to his professional tax preparer so that a reasoned assessment of the proper treatment could be arrived at. On the other hand, there clearly was a defense of "mistake" asserted here as to the failure to report the income earned from the 2003 sale of the promissory note.

In any event, the ATF forms injected Cole's drug addiction into a trial that was far removed from such a subject. Such evidence of major improprieties in Cole's personal life would in many cases likely have occasioned significant unfair prejudice. Nevertheless, even if there was an abuse of discretion in the admission of the ATF evidence, a conclusion we do not reach, we find that any such error was harmless.

Manifestly, a conviction will not be overturned on account of an erroneous evidentiary ruling when that error is deemed harmless within the meaning of Federal Rule of Criminal Procedure 52(a). "[I]n order to find a district court's error harmless, we need only be able to say 'with fair assurance, after

pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Johnson*, 617 F.3d at 292 (quoting *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)).

In this case, there was overwhelming evidence indicating that the $2 million obtained by Cole did not constitute proceeds from the sale of contracts. As already discussed, for example: (1) two of the three purported buyers testified that they were unaware Cole ever received these payments, and Cole arranged for the issuance of separate sellers' settlement reports in a transparent effort to hide the payments from his co-venturers; (2) the purported buyers were themselves the ones who provided the down payments on the contracts, which means that they already owned an interest in the contracts; (3) the sellers testified that Cole represented he was acting on behalf of the partnership, not alone; (4) the surreptitious payments to Cole were identified as commissions on the checks and related documents, and in discussions within OPF; and (5) Cole himself swore in his answers to interrogatories in related civil litigation that these amounts were "commissions and fees" that came from the sellers, not from his partners.

Though the false statements on the ATF forms were at best only tenuously related to proof of the willful mischaracterization of income charged here and posed a genuine risk of prejudice, we are confident that "the judgment was not substantially swayed by the error" of admitting them. *Id.* The potential for substantial undue prejudice arising from the injection of a defendant's drug addiction into a trial involving dishonesty is real, but the jury properly had before it strong evidence of Cole's conversion of partnership funds when the fifth fee was made out to the partnership rather than to B&N, far more salient evidence of Cole's dishonest dealings with his partners. We further note that the district court followed admission of the ATF evidence immediately with a cautionary instruction and that the jury was not so prejudiced as to keep

it from rejecting the allegations regarding fraudulent deductions for charitable donations and business expenses under Counts one, three, and five.

In sum, there was a veritable mountain of evidence against Cole bearing on the over-arching issue at trial: the existence *vel non* of his willful intent to evade taxes arising from his secretly-obtained remuneration in the real estate deals. Accordingly, we cannot plausibly say that an erroneous ruling on an ancillary evidentiary point "substantially swayed" the jury here.[5]

### B.

Cole further contends that evidence of his "lavish spending" was admitted contrary to Rule 404. As the Government argues, however, such evidence does not appear to be character evidence governed by Rule 404. Regardless, the evidence was clearly probative of Cole's motive (e.g., wealth accumulation and maintenance) as the trial court held, and was simply not introduced "for the purpose of proving action in conformity [ ]with" the character of a lavish spender. Fed. R. Evid. 404(b).

For these reasons we reject Cole's claims of prejudicial error under Rule 404(b).

---

[5]The Government argues that any Rule 404(b) error is harmless for the simple reason that Cole went on to testify, thus opening the door to evidence attacking his credibility, like the false statements on the ATF forms. But as we explained in *Johnson*, where an erroneous admission is made during the Government's case-in-chief that damages defendant's character, it is often "impossible to make a post-hoc assessment as to whether [the defendant] would have testified without" the erroneous admission. 617 F.3d at 299 n.7.

IV.

Finally, Cole alleges error in the trial court's refusal to grant him a continuance. In considering a motion for continuance on the basis of health issues, a trial judge must "assess the degree to which a defendant's health might impair his participation in his defense, especially his right to be present at trial, to testify on his own behalf, and to confront adverse witnesses," as well as whether "the proceeding is likely to worsen the defendant's condition." *United States v. Brown*, 821 F.2d 986, 988 (4th Cir. 1987). The judge "may properly consider . . . the medical evidence [and] the defendant's activities in the courtroom and outside of it," among other things. *Id.*

Denial of a motion for a continuance is reviewed for abuse of discretion, and the reviewing court is "not [to] review the medical information before the district court *de novo*; instead, [it is to] look to see whether the district court had sufficient evidence before it to support its decision." *Brown*, 821 F.2d at 988. In addition, the appellant must also establish that prejudice resulted from the erroneous denial. *United States v. Bakker*, 925 F.2d 728, 735 (4th Cir. 1991). We have held that "[f]or a denial of a continuance to constitute an abuse of discretion, the medical repercussions must be serious and out of the ordinary; the impending trial must pose a substantial danger to a defendant's life or health." *Brown*, 821 F.2d at 988.

The issue of a continuance in this case arose very late in the proceedings. As Cole was to be cross-examined during the fourth week of trial, he moved for a mistrial and a continuance, and the court conducted a thorough hearing on the matter. The trial judge repeatedly emphasized that he had seen no documented medical evidence demonstrating that Cole was disoriented or incapable of focusing, and he asked defense counsel to point him to any such evidence. The judge also noted that he had not seen any indication of the alleged disorientation during trial, which included testimony from Cole.

Defense counsel merely reported that Cole told them he was in pain, that he seemed to his counsel to have lost focus during his direct examination, and that an attending physician at the hospital had told one of them that Cole seemed confused. On this last point, the trial judge emphasized that Cole's confusion was nowhere noted on the hospital's report about Cole's earlier visit to the emergency room, and he explained that he could not simply accept counsel's oral representations as evidence.

The trial judge, who showed commendable sympathy and flexibility throughout the hearing, made every effort to allow the defense opportunities to gather adequate evidence. As it was, the court had twice granted Cole mid-trial continuances, once after breaking his clavicle and again after a diagnosis of double pneumonia. There was no medical evidence —or evidence of any kind, aside from defendant's and defense counsel's unsupported claims —to support a finding that Cole was unable to continue trial after he had concluded his direct examination. This unsupported motion came as Cole was to be faced with cross-examination, at the end of a four-week trial comprising the testimony of 34 witnesses. The trial court acted well within its broad discretion in denying Cole another continuance.

V.

We have considered the remaining issues raised on appeal by Cole (e.g., the alleged cumulative effects of the district court's rulings) and find them to lack merit. Accordingly, for the foregoing reasons, the judgment is

*AFFIRMED*.