**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4794

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAWN CHAPELLE COTTMAN,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, District Judge. (1:17-cr-00084-GLR-1)

Argued: January 30, 2020                          Decided: March 23, 2020

Before MOTZ, WYNN and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Erek Lawrence Barron, WHITEFORD, TAYLOR & PRESTON, LLP, Rockville, Maryland, for Appellant. Sean Richard Delaney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Robert K. Hur, United States Attorney, Martin J. Clarke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A grand jury returned a superseding indictment charging Dawn Cottman ("Appellant") with 15 counts of using her tax preparation service, 40 AM Tax Service, to defraud the Government, wire fraud, aggravated identity theft, and filing false tax returns. Following a jury trial, Appellant was convicted on 14 counts, and was subsequently sentenced to a total of 84 months of imprisonment.

Appellant raises two assignments of error. First, she argues the district court improperly denied her motion to suppress statements she made to agents during a search of her home. Second, she argues the district court abused its discretion in allowing testimony that the name of her tax preparation service, "40 AM," stood for "40 Acres and a Mule." Appellant asserts that the reference was overly inflammatory and prejudicial.

For the reasons that follow, we affirm.

## I.

## A.

### Search of Appellant's Home[1]

On May 7, 2013, at approximately 9:45 a.m., federal law enforcement agents executed a search warrant at Appellant's residence. The agents waited until Appellant had left the house and made a "soft entry," meaning they knocked at the door and waited until someone opened it.

---

[1] These facts are drawn from the suppression hearing testimony of two of the agents who searched Appellant's home: Special Agent Mark Schmidt and Special Agent David Meisenheimer.

2

Appellant's brother answered the door. Agents entered the residence wearing vests with "IRS Federal Agents, Police" printed on them. They did not draw their guns upon entering. The agents advised Appellant's brother of their purpose in being there, and "took control of him and [] searched him to make sure that he did not have any weapons." J.A. 104.[2] This meant they "put him up against the wall and then [] had an agent pat him down." *Id.* Meanwhile, other agents conducted a quick preliminary search of the house to make sure no one else was there. They found Appellant's daughter in the house, and agents took her to the living area of the house, near the kitchen on the first floor, where she sat on a sofa next to her uncle (Appellant's brother).

There were "about 15 to 20 agents throughout the house" during the search. J.A. 129. Some agents were standing in the living room with Appellant's brother and daughter "to make sure that they didn't go anywhere and that they were obeying the rules of the search." *Id.* Appellant's brother and daughter were not allowed to move around unless they were escorted by an agent. According to Special Agent Mark Schmidt ("Agent Schmidt"), Appellant's brother and daughter were "free to leave the house" if they wanted. *Id.* at 108. However, they were never actually told they were free to leave.

Some time later, Appellant drove back to her house. When Appellant arrived at her house, Agents approached her car while she was still in it and explained that they were searching her house. They also asked Appellant if she was willing to answer some questions, and she agreed to do so. Appellant parked her car down the street from her home

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

(because the agents' cars were parked close to the house) and walked inside, escorted by agents. The agents suggested that they talk to Appellant in the "club room," a room at ground level but below the primary entry level. Before going downstairs, Appellant checked on her daughter, who was still sitting with Appellant's brother in the living area. Neither Appellant nor her child showed signs of being upset. Appellant was not placed under arrest, was not told she was under arrest, and was not physically constrained. But, if Appellant wanted to move around her own house, she had to be escorted by a female agent.

Appellant went downstairs to the club room with Agent Schmidt and Special Agent David Meisenheimer ("Agent Meisenheimer") to answer their questions. In the club room, there was a window and a door leading to the backyard area. During the interview, other agents were also in the club room searching for evidence. For the entire time Appellant talked to the agents, they did not read Appellant her *Miranda*[3] rights. The officers made no promises or offers of leniency.

The agents testified that during the interview, Appellant did not express concern for her daughter and did not ask to stop the interview, that is, until her attorney called her cell phone 40 minutes into the interview. After she conversed with her attorney for around five minutes, Appellant told the agents she would not answer any more questions. At that point, the agents ended the interview and Appellant went back upstairs and sat with her brother and daughter until her attorney arrived.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## B.

## The Suppression Hearing

Appellant moved to suppress her statements from her interview with Agent Schmidt and Agent Meisenheimer. The district court held a suppression hearing on April 5, 2018. Only Agent Schmidt and Agent Meisenheimer testified at the suppression hearing. At the conclusion of the hearing, the district court denied the motion to suppress.

The district court found the following facts: Appellant arrived at her home in the midst of the execution of the search warrant; Appellant was free to move about her home, as long as she was escorted; Appellant agreed to speak with the agents; the agents and Appellant were seated on the couch in the basement area during the interview; the agents did not draw their guns or raise their voices during their conversation with Appellant and did not provide Appellant with her *Miranda* rights; the agents did not provide any promises of leniency or coerce Appellant into speaking with them; and Appellant fully understood the agent's questions and gave them detailed answers to their questions.

Then, the district court assessed the length of the interview itself. The district court found the interview lasted less than an hour and immediately stopped after Appellant spoke with her attorney and advised that she did not want to answer any more questions.

The district court ultimately concluded that the interview was noncustodial because Appellant freely and voluntarily participated in the interview, and knowingly and voluntarily terminated it. Because the interview was noncustodial, *Miranda* warnings were not required. Therefore, the district court denied the motion to suppress.

C.

Trial Evidence and Testimony

Appellant's case proceeded to a six-day jury trial, during which the Government called 17 witnesses, including Appellant's co-conspirators, and introduced around 270 exhibits. The evidence demonstrated that Appellant was the sole proprietor of the tax preparation company "40 AM Tax Service." Between January 2009 and March 2013, Appellant prepared and filed hundreds of individual income tax returns from her home office. Appellant filed tax returns with false information in order to generate larger refunds for her friends, family, and associates, and she used friends and associates to access stolen identities in whose names she filed fraudulent tax returns. Additionally, the Government presented evidence that Appellant's scheme resulted in over $780,000 in fraudulent tax refunds wired to sixteen bank accounts opened in the name of 40 AM Tax Service.

1.

*Testimony of Co-conspirators*

Three co-conspirators -- Monique Montgomery, Tangaba Crosby, and Shante Brown -- testified against Appellant.

Montgomery testified that she was Appellant's friend and helped her with the tax scheme. She testified that Appellant paid her around $200,000 to obtain the social security numbers ("SSNs") and dates of birth ("DOBs") of strangers, and that, after getting refunds using this information, Appellant would wire part of the money to Montgomery's personal bank accounts. According to Montgomery's testimony, Appellant also prepared

6

Montgomery's tax returns and made sure she received refunds based on false information, such as a false claim that Montgomery cared for disabled children.

Crosby testified that Appellant paid her over $290,000 for stolen SSNs and DOBs, which Crosby gathered from people at a methadone clinic and from a pastor who worked with prisoners. Like Montgomery, Crosby also testified that Appellant filed false tax returns for her, listing false information about her dependents and business income, resulting in large refunds.

Brown, Appellant's cousin, testified that Appellant prepared her tax returns using false dependent information and fictitious business losses. Appellant also paid Brown around $158,000 for stolen SSNs and DOBs, some of which Brown obtained from her boyfriend who worked for a state government agency.

2.

*Testimony of Agent Meisenheimer*

At trial, Agent Meisenheimer testified about the interview he and Agent Schmidt conducted with Appellant. Following are some of the statements elicited from Appellant during her interview with Agent Meisenheimer and Agent Schmidt and disclosed to the jury during the testimony of Agent Meisenheimer:

- "40 AM Tax Service" was Appellant's tax preparation business.

- Appellant had been preparing tax returns since 2005.

- Appellant did not have a tax preparation number.

- Appellant completed tax returns for people "[i]n her residence."

- Appellant charged each client "between $300 and $600."

7

- Appellant would talk to clients "face to face" or "reach out to them over the phone."

- When the officers asked why Appellant had some of the refunds go to her personal bank account, Appellant replied, "some clients did not have their own bank account," so she had the money deposited into her account. Then, she "gave cash to that client directly or gave cash to whoever referred that client to her to give ultimately to the client."

- Appellant completed the tax returns through Turbo Tax.

- She received referrals from Montgomery.

J.A. 707–12.

3.

*Testimony about "40 Acres and a Mule"* [4]

a.

As noted, Appellant was the sole proprietor of the tax preparation company "40 AM

Tax Service." During the Government's direct examination of Montgomery, Government

---

[4] The phrase "40 Acres and a Mule" is historically associated with Special Field Order No. 15 issued on January 16, 1865, by Union General William T. Sherman. This Order was meant to provide reparations to formerly enslaved persons. *See* Henry Louis Gates, Jr., *The Truth Behind '40 Acres and a Mule'*, Public Broadcasting Service, https://www.pbs.org/wnet/african-americans-many-rivers-to-cross/history/the-truth-behind-40-acres-and-a-mule/ (last visited Mar. 4, 2020). In relevant part, the Order provided Black families with "a plot of not more than (40) forty acres of tillable ground . . ." Major General W. T. Sherman, Special Field Order No. 15 (Jan. 16, 1865), http://www.history.umd.edu/Freedmen/sfo15.htm. The Order did not provide for a mule, but "some [families] also received leftover Army mules." Sarah McCammon, *The Story Behind '40 Acres and a Mule'*, NPR Code Switch (Jan. 12, 2015, 6:02 PM), https://www.npr.org/sections/codeswitch/2015/01/12/376781165/the-story-behind-40-acres-and-a-mule. However, after the assassination of President Abraham Lincoln, President Andrew Johnson reversed the Order. *Id.*

counsel asked, "During your conversations with Ms. Cottman, did she ever tell you about her views of the Government?" J.A. 580. Defense counsel objected, explaining that the answer would be "some disparaging comment to the Government," "add very little value," "inflammatory," and "more likely to appeal to the emotions of the jury." *Id.* at 581. The district court held a sidebar argument. During this argument, the district court inquired, "[T]his goes directly to intent . . . Does it not?" to which defense counsel replied, "It might." *Id.* Government counsel argued the answer "directly refutes any defense of mistake, accident that she lost control of her business, that she didn't know what she was doing." *Id.* Government counsel proffered, "[T]he next question is going to be what does 40 AM Tax Service stand for and the answer is going to be 40 Acres and a Mule. . . . [T]hen the follow-up is going to be what did you understand that to mean?" *Id.* at 582. Government counsel added, "And it's that she wants everything. She's entitled to everything. And I think that's directly relevant to her intent in preparing these returns and getting this money." *Id.* Defense counsel stated he was "not sure of the exact history of [the phrase]" but thought it had "racial undertones" and would be "unfairly prejudicial to the jury." *Id.* at 583. The district court stated it was "familiar with the terminology and what it means." *Id.*

Another Government counsel interjected that Brown would also be testifying about Appellant's use of the phrase. He explained, "Brown is going to testify [that] [i]t was a common phrase that [Appellant] used. 40 AM -- you know, my 40 Acres and a Mule. This is my 40 Acres and a Mule." J.A. 583. Government counsel offered, "I can rephrase the question and go directly to what is the name of the company and what did that mean to

you." *Id.* The district court replied, "Oh, well if you go directly to that, that's fine. I mean, the name 40 AM is -- I mean, that's why she named the company . . . [A]re you objecting to that question?" *Id.* Defense counsel replied, "I'm objecting for the record for the reasons I stated before." *Id.*

The district court overruled the objection, explaining:

> Well certainly based upon the proffer that I have here I think that the name of the company and the reasons for its name are certainly relevant. I don't think that they're unduly prejudicial to the defendant, sort of they are probative of the defendant's intent, as well as knowledge in this case. So the objection is certainly noted. I'm going to go ahead and allow Counsel to ask the question as rephrased.

J.A. 583–84. The following exchange then occurred:

> [GOVT COUNSEL]: Ms. Montgomery, did you have conversations with Ms. Cottman about the name of her company?
>
> [THE WITNESS]: Yes.
>
> Q. Why did Ms. Cottman name her company 40 AM Tax Service?
>
> A. Well, you mean from my -- how I feel? She never actually came out --
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Oh, okay. Well, she never told you what the name stood for?
>
> THE WITNESS: Yeah, she told me what it stood for but I took it as meaning --
>
> [GOVT COUNSEL]: The question is what did it stand for?
>
> THE COURT: What did she tell you it stood for.

10

THE WITNESS: 40 Acres and a Mule.

*Id.* at 584. The Government then moved on with its questioning on other matters.

b.

Shortly after that exchange, the district court took an abrupt recess after observing the "extraordinarily animated" demeanor of Juror No. 2. J.A. 586. The district court explained, "[A]s a result of the last statement [i.e., "40 Acres and a Mule"] [Juror No. 2] expressed a clear emotional side, put his head in his hands and was shaking his head." *Id.* The district court then added it also "heard [a] big sigh" from Juror No. 2. *Id.* at 588. As a result, the district court expressed concern about the impartiality of Juror No. 2.

Defense counsel moved for a mistrial, explaining, "we specifically warned about that question, that it would be unfairly prejudicial." J.A. 588–89. The district court denied the motion for mistrial. The Government then commented:

> [E]verybody has a purpose in naming their business, right? It's their baby. And she has named her business something. The problem is that it could potentially have a racial aspect to it. And any time we have that anywhere, there's a concern. But I think as long as Your Honor controls the questions as Your Honor is doing, we don't have to go anywhere near what Counsel may be suggesting would happen outside this courtroom. But right now in the courtroom, there's been no problem.

*Id.* at 589–90.

The district court conducted voir dire of Juror No. 2:

> THE COURT: During the course of the testimony, especially the last question and answer, I heard you sigh and exasperate and put your head in your hands; is that correct?

11

A JUROR: Yes.

THE COURT: Why did you do that?

A JUROR: It was an emotional reaction to [Montgomery's] testimony. Not an intellectual one, an emotional one.

THE COURT: But you need to stay objective with regard to this case.

A JUROR: I will. That answer made me go over the line.

THE COURT: Okay. And why did you go over the line? What about that answer caused you to go over the line?

A JUROR: The reference to 40 Acres and a Mule.

THE COURT: Have you judged that as being accurate, the testimony?

A JUROR: Oh, sure it was accurate.

THE COURT: Okay. Do you believe it was truthful?

A JUROR: Absolutely.

. . .

THE COURT: Let me ask you this: Do you believe that you have the ability to continue to listen to the evidence, all the evidence and not make any judgments on this case until after the conclusion of all of the evidence or have you -- do you have an opinion about the outcome of this case so far?

A JUROR: I have an opinion.

. . .

THE COURT: . . . Have you discussed your opinions with any other jurors?

A JUROR: As per your instructions, I haven't.

12

J.A. 591–94. The district court then dismissed the juror.

c.

Later, when examining Brown, Government counsel gave the court notice that it would again ask the question regarding the name of Appellant's company. Defense counsel again objected. And the district court again overruled the objection.

The examination of Brown then proceeded as follows:

> [GOVT COUNSEL]: Ms. Brown, were you aware of the name of Ms. Cottman's tax preparation business?
>
> [WITNESS]: Yes.
>
> Q. What was it?
>
> A. 40 AM Tax Services.
>
> Q. And did she explain to you why she called it that?
>
> A. Yes.
>
> Q. And why did she call it that?
>
> A. 40 Acres and a Mule, give me mine now.
>
> Q. I'm sorry, what was the last part?
>
> A. Give me mine now.
>
> Q. Give me mine now?
>
> A. Yes.

J.A. 732.

There was no further mention of the phrase "40 Acres and a Mule," including during closing arguments.

13

II.

A.

Motion to Suppress

Because the district court denied the motion to suppress, we view the facts in the light most favorable to the Government. *See United States v. Black*, 707 F.3d 531, 534 (4th Cir. 2013). We review a district court's factual findings in a motion to suppress for clear error, and its legal determinations de novo. *See id.* at 537 (citation and quotation marks omitted).

Appellant contends that, when agents questioned her in the lower room of her home, she was subject to custodial interrogation without the benefit of hearing her *Miranda* rights, in violation of the Fifth and Sixth Amendments. For its part, the Government asserts that, based on the facts, Appellant was not subjected to a custodial interrogation requiring *Miranda* warnings.

1.

Statements "made during a custodial interrogation will be suppressed unless police advise the defendant of [her] rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the defendant knowingly, intelligently, and voluntary waives those rights." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (internal quotation marks omitted). It follows that "[c]oncerns under *Miranda* only arise when a defendant *is in custody* and subjected to interrogation." *Id.* (emphasis supplied) (citations omitted).

"When deciding whether a defendant not under formal arrest was in custody -- and thus if the *Miranda* requirements apply -- a court asks whether 'under the totality of the

circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.'" *Giddins*, 858 F.3d at 879 (quoting *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (internal quotation marks omitted)); *see also United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001). The "operative question" in determining whether a defendant was in custody for *Miranda* purposes "is whether, viewed objectively, 'a reasonable [person] in the suspect's position would have understood [her] situation' to be one of custody." *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). We should "examin[e] 'all of the circumstances surrounding the interrogation' and determin[e] 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam) (internal quotation marks omitted)). Of course, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

In answering the question of custody, we have looked to "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Hashime*, 734 F.3d at 283 (internal quotation marks omitted); *see also United States v. Weaver*, 282 F.3d 302, 310 (4th Cir. 2002).

2.

In support of her suppression argument, Appellant relies heavily on *Hashime*, claiming it is "substantially similar" to this case. Appellant's Br. 16. In that case, law-enforcement agents obtained a search warrant to search for child pornography in the home of Faisal Hashime, a 19 year old college student living at home with his parents. *See* 734 F.3d at 280. At 9:00 am, 15 to 30 state and federal law-enforcement agents who were equipped with a battering ram banged on the entrance of Hashime's home and yelled for entry. *See id.* Upon entry, agents had their guns drawn, went to Hashime's bedroom where he was in bed, naked and asleep. *See id.* The agents ordered Hashime to get out of bed at gun point. *See id.* Hashime got out of bed and put on boxer shorts. *See id.* Agents then held Hashime by his arm and marched him outside in the "chilly weather" with his other partially clothed family members. *Id.* When Hashime's family was permitted back inside their home, agents kept them all in the living room during their search and accompanied them wherever they went at all times. *See id.* at 280, 281. They all were interrogated individually by agents. *See id.*

As for Hashime, two officers took him to the finished basement but asked him questions in an unfinished area used as storage space. *See* 734 F.3d at 281. They questioned him for three hours, during which time his family was not able to see him. *See id.* The officers told Hashime's mother that he was under arrest. *See id.* In addition, the officers secretly recorded the interrogation, even though one officer told Hashime they were not recording it. *See id.* The agents did not give Hashime *Miranda* warnings until over two hours into the investigation, but before then, he admitted to possessing child

16

pornography and gave officers the password to his computer. *See id.* The district court determined Hashime "was free to leave and . . . believed himself to be free to leave," and denied the Hashime's suppression motion. *Id.* We reversed.

In reversing, we relied on three points. First, although the Government claimed Hashime was told many times that he was free to leave, "other statements made by law enforcement undercut [that] claim." *Hashime*, 734 F.3d at 283. For example, when one officer left to go upstairs, he told Hashime, "[W]e got to kind of keep an eye on you. . . . I can't leave you here with nobody here." *Id.* at 284. And when asking Hashime about his prior sexual history with minors, the officer said, "I need to know, and I need you to be completely honest with me here even if you're afraid." *Id.* at 283.

Second, we noted that simply saying a suspect is free to leave "by itself does not make the interrogation non-custodial." 734 F.3d at 284. Rather, in Hashime's case,

> [he] had awoken at gunpoint to a harrowing scene: his house was occupied by a flood of armed officers who proceeded to evict him and his family and restrict their movements once let back inside. Throughout the interrogation, Hashime was isolated from his family members, with his mother's repeated requests to see him denied. It is little wonder that Hashime testified that, during the interrogation, "I didn't think I had any chance to leave . . . . I felt that I was . . . trapped and . . . had to stay where I was and do what I was told."

*Id.*

And finally, we observed that the home setting does not make the questioning noncustodial. *See* 734 F.3d at 284. Indeed, "[w]hile courts are generally less likely to characterize as custodial interrogations in familiar settings like the home, the particular facts of Hashime's interrogation cut in the other direction." *Id.* (citation omitted). A

17

"suspect 'may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.'" *Id.* (quoting *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008)); *see also United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) (interrogation was custodial where 24 FBI agents executed a search warrant on the defendant's home, the suspect was isolated during the interrogation, and the defendant and his family lost control over their home).

However, *Hashime* is a far cry from this case. The only similarities between this case and *Hashime* are that the questioning took place in the home, Hashime and Appellant were separated from family members during questioning, and both were interviewed in a basement area (although Hashime was taken to a storage area, not a living space). *Hashime* involved upwards of 30 officers, a three-hour interrogation, a fraudulent promise not to record the interview, an aggressive entry, and denial of requests for family members to see one another. None of these factors are present here.

3.

Appellant also relies on *United States v. Colonna*, 511 F.3d 431 (4th Cir. 2007) and *United States v. Freeman*, 61 F. Supp. 3d 534 (E.D. Va. 2014). But these cases are inapposite to the case at hand. In *Colonna*, "the house was inundated with over twenty-three FBI agents"; Colonna was awakened at gun point and guarded at all times; he was questioned in an FBI vehicle where he was "bracketed" by two armed agents; and agents told Colonna's mother in his presence that if she left the house "she could not reenter." 511 F.3d at 436. In *Freeman*, which is a nonprecedential district court decision, officers entered Freeman's home around 6:00 a.m. with drawn firearms "yelling and screaming";

18

the family was corralled to one location where several armed officers guarded them; officers met Freeman on the third floor of his home when he was exiting his bedroom wearing bedclothes, and the officer pointed a firearm and blinding LED light at Freeman. 61 F. Supp. 3d at 541. When Freeman defecated on himself out of fear, the officers would not let him clean up in private. *See id.* at 542.

4.

Instead, we conclude the case at hand is more comparable to (and less troublesome than) cases in which encounters were found to be noncustodial: *United States v. Hargrove*, 625 F.3d 170 (4th Cir. 2010) and *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001). In *Hargrove*, there were 10 to 15 officers executing a search warrant on Hargrove's residence shortly after 6:00 a.m., some officers had firearms drawn during the initial entry while Hargrove was in his pajamas when questioned, presumably just getting up from bed. *See* 625 F.3d at 173, 174. At the hearing, Hargrove testified that officers banged on the front door, an officer blocked the entrance to the kitchen while he was being questioned, and when he came downstairs an officer pointed "what looked like an M-16" right at Hargrove. *See id.* at 174, 175. He said he felt like he would be arrested at any time. *See id.* at 175. But this court affirmed the district court's conclusion that the encounter was noncustodial, explaining that the agents told Hargrove he was not under arrest and was free to leave, and "[t]he mere presence of armed law enforcement officers during the interview is not sufficient to create a custodial situation." *Id.* at 179.

Likewise, in *Parker*, the district court found (and we affirmed) a noncustodial setting where the officers informed Parker she was not under arrest, Parker "was not

19

handcuffed or otherwise restrained," and "the agents did not draw their weapons in her presence." 262 F.3d at 419. The interview occurred in Parker's home, and a relative twice entered the room where agents were interviewing Parker. *See id.* Parker "was not forced to enter the room with the officers, and she was never told that she was not free to leave." *Id.*

5.

Based on the decisions discussed above, we hold the district court did not err in deciding that a reasonable person in Appellant's position would not have felt her freedom of action was curtailed to a degree associated with formal arrest. *See Berkemer*, 468 U.S. at 440. In other words, viewing the totality of the circumstances, a reasonable person in Appellant's position would have felt she could terminate the interrogation and leave. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Therefore, Appellant did not experience a custodial interrogation, and a *Miranda* warning was not required.

The officers showed up at 9:45 a.m. (not in the wee hours of the morning) when Appellant was not there. They made a soft entry and were given access to the house without issue. When Appellant arrived back home, the agents approached when she was still a distance away to explain what was happening. There is no indication the officers' demeanor was intimidating or threatening, and Appellant agreed to talk with them. There were no weapons drawn. Appellant was not physically restrained in any way, except that officers had to escort her if she moved around the home, which would be the case with any execution of a search warrant. *See Hargrove*, 625 F.3d at 179 (noting the importance of "secur[ing] the site for conducting a search pursuant to a valid search warrant").

20

Appellant was separated from her child and brother, but there is no indication that she was unable to see them if she wanted to do so. The child was not upset, and Appellant was not upset by the separation. Although she was on a different floor from her family, Appellant was nonetheless in a living area on a sectional couch. And it is evident that Appellant could end the interview and leave if she wanted to, because that is exactly what she did.

Therefore, for all of the foregoing reasons, we affirm the district court's denial of the suppression motion.

B.

Trial Evidence

We next address Appellant's evidentiary challenge. We must first determine whether or not the admission of "40 Acres and a Mule" was in error. If the admission of "40 Acres and a Mule" was in error, we then must determine whether this error was harmless.

We view the facts adduced at trial in the light most favorable to the Government, the prevailing party. *See United States v. Torrez*, 869 F.3d 291, 295 (4th Cir. 2017). We review Federal Rule of Evidence 403 challenges for an abuse of discretion, but legal conclusions concerning the Rules of Evidence or the Constitution de novo. *See United States v. Rivera*, 412 F.3d 562, 566 (4th Cir. 2005). However, "a conviction will not be overturned on account of an erroneous evidentiary ruling when that error is deemed harmless within the meaning of Federal Rule of Criminal Procedure 52(a)." *United States v. Cole*, 631 F.3d 146, 154 (4th Cir. 2011). "In order to find a district court's error

21

harmless, we need only be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Id.* at 154–55 (alteration omitted) (quoting *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (internal quotation marks omitted)).

Appellant argues that the admission of testimony about the abbreviation of "40 AM" in "40 AM Tax Service" and her alleged statement about what it meant to her "had little, if any, probative value as to criminal intent and unnecessarily injected a racially divisive and inflammatory issue into her trial." Appellant's Br. 12. Appellant claims that, although the phrase 40 Acres and a Mule "is not [alone] a racial stereotype," Oral Arg. at 5:58–6:02, *United States v. Cottman*, No. 18-4794 (4th Cir. Jan. 30, 2020), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments, the accompanying use of the phrase "Give me mine now" about her tax preparation service by the Government attached a racially divisive and inflammatory connotation with the phrase 40 Acres and a Mule. Specifically, this connotation is "a statement of entitlement to a certain group of people who believe they should get something because their ancestors were enslaved. And there is a resentment from certain members of the populous about that." *Id.* at 10:31–46. Further, Appellant argues, "the Government's resort to racial prejudice or stereotypes as indicia of guilt is reviewed for structural error and automatic reversal is presumed." Appellant's Br. 22 (citing *Miller v. North Carolina*, 583 F.2d 701 (4th Cir. 1978)); *see also* Appellant's Reply Br. 7 n.1.

For its part, the Government argues the testimony "constituted direct evidence of [Appellant's] criminal intent and knowledge to use '40 Am [sic] Tax Service' to defraud

22

the IRS in order to get what she believed she was due." Appellee's Br. 19. Additionally, to the extent the district court erred with the admission of this testimony, the Government argues the error was harmless beyond a reasonable doubt.

1.

Evidence is "relevant" if "it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Nonetheless, pursuant to Federal Rule of Evidence 403, relevant evidence is inadmissible where "there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1134 (4th Cir. 1988) (quoting *Morgan v. Foretich*, 846 F.2d 941, 945 (4th Cir. 1988)). "Testimony concerning racial remarks is certain to be emotionally charged." *Id.* But testimony concerning racial remarks is not per se inadmissible evidence. *See id.* at 1132, 1134 (overturning district court ruling under Rule 403 that defendant who was not hired by a company "could not question the [company] members as to their use of racial slurs and epithets such as" the n- word); *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1290 (11th Cir. 2008) (affirming admission of the n- word as used by employees because it was relevant to racial harassment on the job); *United States v. Allen*, 341 F.3d 870, 885–86 (9th Cir. 2003) (affirming admission of photographs of defendants in "Heil Hitler" poses and standing before a large swastika that they later set on fire, as well as a registration form for the Aryan Nations World Congress, because the items were "relevant to proving the defendants' motive,

23

intent, and plan"); *United States v. McInnis*, 976 F.2d 1226, 1232 (9th Cir. 1992) (affirming admission of Nazi swastikas because they were "clearly relevant to establishing [defendant's] racial hatred").

2.

Here, when defense counsel initially objected to the contested line of questioning, the Government had just asked Montgomery, "[D]id [Appellant] ever tell you about her views of the Government?" J.A. 580. At sidebar, defense counsel was concerned that the answer to that question was "going to be some disparaging comment to the Government" and that it would "add very little" but would be "inflammatory" and "appeal to the emotions of the jury." *Id.* at 581. The district court inquired, "[T]his goes directly to intent . . . Does it not?" to which defense counsel replied, "It might." *Id.* The Government represented that there was "no proffer of any evidence regarding any disparaging comment related to the Government." *Id.* at 583. Further, the Government agreed to move on and "go directly to what is the name of the company and what did that mean to you." *Id.* The court replied, "Oh, well if you go directly to that, that's fine. I mean, . . . that's why she named the company." *Id.* The court then concluded the "name of the company and the reasons for its name are certainly relevant [and not] unduly prejudicial . . . [T]hey are probative of [Appellant's] intent, as well as knowledge . . . ." *Id.* at 583–84. After that, the Government inquired what Appellant said the name of 40 AM stood for, and Montgomery responded "40 Acres and a Mule." *Id.* at 584. During the testimony of Brown, the Government again inquired why Appellant called her business 40 AM Tax Service. *See id.* at 732. Like Montgomery, Brown responded "40 Acres and a Mule." *Id.* She added that Appellant also

24

said it meant "give me mine now." *Id.* The Government asked Brown to confirm her response, which she did. *See id.*

On the full record here, we conclude the district court did not abuse its discretion in admitting the testimony at issue. The fact is Appellant herself named her business 40 AM Tax Service because it stood for 40 Acres and a Mule. During cross examination and during closing argument, Appellant's counsel drove home the theory that Appellant did not have the requisite intent to defraud. She "received some $300,000 after the death of her father . . . just prior to the incident that's in question." J.A. 1117. Thus, presumably, she would not have had to engage in this money-making scheme. He also argued that Appellant may have just gotten "sloppy" with the tax returns and acted in "good faith." *Id.* at 1124, 1125. The Government had every right to introduce evidence that Appellant indeed intended to defraud the Government. *See* J.A. 1031 (instruction of the element of "intent to defraud" for the offense of making a false claim defined as "to act knowingly and with specific intent to deceive for the purpose of causing some financial or property loss to the United States."); *see also id.* at 1040, 1044. The testimony that Appellant believed "40 Acres and a Mule" to mean "Give me mine now" is certainly probative of that issue.

Moreover, Appellant's argument that the phrase is unduly prejudicial does not carry the day. The fact that the phrase may have a negative connotation depending on the context is not dispositive pursuant to Rule 403. The district court pointed out that the phrase "40 Acres and a Mule" "isn't particularly racially offensive." *See* J.A. 731 (noting the name of Spike Lee's production company is named after 40 Acres and a Mule). Although the district court found the phrase was not "particularly racially offensive," this is not at all

25

conclusive of the prejudicial effect of the phrase. A racial remark elicits differing emotional responses from individuals depending on who hears the remark. Indeed, Juror No. 2 is a prime example of an individual who responded adversely to the racial remark.

Nevertheless, Appellant fails to demonstrate how the risk of the testimony about 40 AM Tax Service is disproportionate to the probative value of the offered evidence for intent. Appellant simply relies on the excitement and dismissal of Juror No. 2 in support of her claim. However, Juror No. 2 was the sole juror who demonstrated a visible emotional response after hearing what the abbreviation of "40 AM" stood for in 40 AM Tax Service. And the district court promptly dismissed him shortly thereafter. No other juror reacted in this way after hearing the testimony about 40 AM Tax Service before or after dismissal of Juror No. 2. Perhaps the other jurors felt the same as Juror No. 2. Perhaps not. And, significantly, the Government only elicited the meaning of the name of Appellant's company twice during the course of a six-day trial wherein 17 witnesses testified. It was not mentioned otherwise. Without clarity or more from Appellant concerning the prejudicial effect of the testimony about 40 AM Tax Service, we conclude the district court properly admitted this testimony.

3.

In any event, even if the district court erred, the error was harmless. As explained above, there was voluminous evidence supporting the charges that Appellant was engaged in a conspiracy to file fraudulent tax returns and defraud the Government. And references to "40 Acres and a Mule" occurred with only two witnesses over the course of just 20 lines

26

of questioning in the transcript in the span of a six-day jury trial. The Government moved on and never mentioned this phrase again.

Therefore, the judgment of the jury was not substantially swayed by the alleged error of the testimony about 40 AM and any error was harmless.

III.

For the reasons set forth herein, we affirm the judgment of the district court.

*AFFIRMED*